UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
_____

JOHN SISOLAK and KEVIN BOLCH, Individually
And on Behalf of All Others Similarly Situated,

                              Plaintiffs,

                                                       Civil Case No.

           -against-

FORD MOTOR COMPANY,

                              Defendant.
_____

## CLASS ACTION COMPLAINT

Plaintiffs, JOHN SISOLAK and KEVIN BOLCH, ("Plaintiffs"), on behalf of

themselves and all other persons similarly situated, bring this action against

defendant, FORD MOTOR COMPANY ("FORD") based upon the best of their

personal knowledge, information and belief, formed after an inquiry reasonable

under the circumstances, and allege as follows:

## NATURE OF THE ACTION

1.     This case arises from FORD's sale and lease of over 32,000 Ford Explorer

models that are specifically sold annually to state agencies, counties, towns and

municipalities throughout the US that are modified for law enforcement.  These

models are classified as Police Interceptor Vehicles and used by Police Departments

and law enforcement agencies as marked police vehicles.

2.     FORD knew or should have known that these Explorer models, manufactured

from 2011 through 2017 are dangerous and defective for operators and passengers

such that exhaust and other gases, including lethal quantities of carbon monoxide,

may enter the passenger compartments of the vehicles.  The potential exposure to carbon monoxide renders these vehicles unsafe to drive.  Indeed, FORD has acknowledged a problem with the Explorers that are modified for police and law enforcement use but has failed to remedy the leaks that permit dangerous fumes from entering the cabins of these vehicles.

3.  FORD's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on.  Customers may indicate the odor smells like sulfur."  FORD's TSB 12-12-4 provides instructions that FORD claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

4.  Subsequent to TSB 12-12-4, FORD issued Technical Service Bulletin 14-0130 ("TSB 14-0130"). entitled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles and adds the 2014 and 2015 models' year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

5.  FORD's TSB's 12-12-4 and 14-0130 however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles.  Moreover, upon information and belief, the problem in police equipped Ford Explorers is even more prevalent.  FORD's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, and do not directly

notify non-Ford automotive repair facilities or law enforcement personnel about the defects associated with TSBs 12-12-4 and 14-0130.

6.    Further, although FORD has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, and it developed a purported fix to the problem, FORD provided no notice to plaintiffs or the proposed class members about the defect and the potential exposure to lethal carbon monoxide in 2011 through 2015 model year Ford Explorers.

7.    Upon information and belief, the problem with the 2015 model year Ford Explorers continued to 2016 and 2017 models, which continue to allow dangerous and potentially lethal fumes to enter the passenger cabins of these vehicles.  Ford has sold or leased approximately 32,000 of these Explorers modified for law enforcement use nationwide since 2011.  Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

8.    FORD designed, manufactured, sold and leased the 2011 through 2017 model year Ford Explorers when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify plaintiff and the proposed class members of the defect in the 2011 through 2017 model year Ford Explorers

that exposed plaintiff, the proposed class member, and others, to a life safety

hazard.

9.      Plaintiffs and the members of proposed class reasonably expected to operate

their Ford Explorer vehicles in a normal and customary manner, free from exposure

to potentially deadly gases.  Moreover, as the proposed class encompasses law

enforcement personnel, FORD is aware that these vehicles, in particular, may be

subject to sudden acceleration and vigorous driving.

## JURISDICTION AND VENUE

10.     The provisions of the Class Action Fairness Act ("CAFA"), 18 U.S.C. § 1332(d)

explicitly provide for the original jurisdiction of the Federal Courts in any class

action in which any member of the plaintiff class is a citizen of a State different

from any defendant, and in which the matter in controversy exceeds the sum of

$5,000,000, exclusive of interests and costs.

11.     Plaintiffs allege that the total claims of individual class members in this

action are well in excess of $5,000,000 in the aggregate, exclusive of interests and

costs, as required by 28 U.S.C. §§ 1332(d)(2)(5).

12.     Plaintiffs are Citizens of New Jersey.  FORD is a Delaware corporation with

its principal place of business in Michigan.

13.     Diversity of citizenship exists under CAFA, as required by 28 U.S.C. §§

1332(d) (5) (B).

14.     The total approximate number of members of the proposed Plaintiff Class is

at least 1000 persons.

15.     The Court has personal jurisdiction over FORD because FORD conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District and caused harm to class members residing in this District.

## PARTIES

17.     Plaintiff, JOHN SISOLAK is a citizen and resident of East Brunswick, NJ 08816.

18.     Plaintiff, KEVIN BOLCH, is a citizen and resident of Freehold, NJ 07728.

19.     FORD is a Delaware corporation with its principal place of business in Michigan.  In this Complaint, "FORD" refers to the named defendant and all related, successor, predecessor and subsidiary entities to which these allegations pertain.

## CARBON MONOXIDE

20.     According to the Centers for Disease Control, excess exposure to Carbon Monoxide is responsible for more than 400 deaths every year in the United States.

21.     Exposure to Carbon Monoxide is particularly dangerous because the gas is odorless and symptoms-loss of consciousness, nausea, headaches, or light headedness-mimic flu- like symptoms, delaying reaction time from victims and emergency personnel in determining the root cause of the injury.

21.     CO is a potent neuro- and cardiovascular toxin. CO is slightly lighter than air. It mixes freely with air in any proportion, moves with air in bulk transport, and adsorbs to few substances in common use.

23.     CO is generally produced by the combustion of carbonaceous compounds.

24.     CO is not detectable by humans without the use of chemical or electronic equipment.

25.     When inhaled by the body, CO primarily reacts with heme-containing substances such as hemoglobin, contained in red blood cells. In doing so, it blocks the carriage of oxygen by these cells.

26.     Inhalation is the primary route of CO uptake. Small amounts of CO are also produced in the body by degradation of hemoglobin and related compounds. Exposure to low levels of CO can occur outdoors as well as indoors. Sources of CO indoors and outdoors are usually the combustion of fossil fuels.

27.     Since 2000, it has been understood that the effect of CO exposure is due to hypoxia, a condition or state in which the supply of oxygen is insufficient for normal life functions.

28.     CO enters the body via inhalation and is diffused across the alveolar membrane with nearly the same ease as oxygen.  After dissolving in the blood, it is quickly bound to hemoglobin (Hb) to form carboxyhemoglobin (COHb), which is measured as the percent of hemoglobin bound. CO competes with oxygen for the hemoglobin binding sites, but unlike oxygen, which is quickly and easily released from its hemoglobin bond, CO remains bound for a much longer time.

29.    The result of COHb build-up over time is hypoxemia, a condition or state where there is a low arterial oxygen supply. CO also increases the binding strength of oxygen to hemoglobin, making release of oxygen to tissue more difficult.

30.    The great body of research on CO has revealed various cellular mechanisms that do not require hypoxic stress. Intracellular uptake of CO could be a major cause of neurological damage. When CO binds to cytochrome oxidase, it causes mitochondrial dysfunction. Mitochondrial disease is a chronic, genetic disorder that occurs when the mitochondria of the cell fail to produce enough energy for cell or organ function. These processes are not dependent on "hypoxia" per se.

31.    Other recent studies have found that CO poisoning can cause immune system dysfunction that causes decrements in cognitive functioning (Thom et al., 2004).

32.    There is a growing consensus that for CO, as well as several other chemical toxins and ionizing radiation, no AEL (Acceptable Exposure Level) exists (Schwela, 2000). In the past, a so-called "safe level" was arbitrarily set at a point at which no health effects could be detected or at least the number and severity identified were deemed acceptable. Research and literature on carbon monoxide demonstrates that CO exposure at levels less than 9 ppm can result in health effects.

33.    There may be no AEL for CO, and the lower limit of CO exposure that the scientific community believes will not cause injury or morbidity has decreased with time and continues to do so.

34.    Epidemiological studies involving large population groups, where exposures are generally at very low CO levels, have demonstrated increased incidences of low

birth weight, congenital defects, infant and adult mortality, cardiovascular admissions, congestive heart failure, stroke, asthma, tuberculosis, pneumonia, etc. (WHO 2010). Dose-effect relationships are suggested in some epidemiological studies. The body of literature is large and growing. The findings are consistent with subtle but often profound health effects at low CO levels.

35.     The 2011-2017 Ford Explorer is a gasoline-fueled passenger carrying motor vehicle. The Owner's Manual provides no restrictions with regard to what passengers can be accommodated, and it provides no restriction as to the duration of occupancy within the passenger cabin. As such, toxic limits designed to maintain health must be those appropriate for the most sensitive and vulnerable humans who may choose to drive or ride in it.

36.     The Ford Motor Company Owner's Manual for the Explorer (pg. 208) contains a warning that "Carbon monoxide is present in exhaust fumes - Take precautions to avoid its dangerous effects." This warning demonstrates that Ford was previously aware of the threat to human health and safety posed by CO.

37.     Ford Motor Company documents show that CO may infiltrate the passenger cabin of 2011-2017 Ford Explorers, as engine exhaust fumes from the exterior rear of the vehicle seeps into the cabin.

38.     People riding in the 2011-2017 Ford Explorer may be exposed to CO at significantly increased levels compared to those same people inhaling outside air.

39.     The infiltration of exhaust gas, including carbon monoxide into the passenger cabin of 2011-2017 Ford Explorers, is unacceptable and is potentially dangerous to human health and safety.

40.     CO exposure by humans of all ages, conditions of health, and under various environmental conditions inside the 2011-2017 Ford Explorers should not exceed the 201O indoor WHO guideline that applies to 24-hours of CO exposure, i.e. 6.1 ppm, computed as a time-weighted average (TWA).

41.     In concert with the above, or alternatively, exposures of humans of all ages, conditions of health, and under various environmental conditions inside the 2011-2017 Ford Explorers, should not exceed the EPA, outdoor CO guideline that applies to 8-hours of CO exposure, i.e. 9.0 ppm, computed as a time-weighted average (TWA) over 8-hours.

42.     Exposure to CO greater than these standards inside a 2011-2017 Ford Explorer produces an unacceptable level of risk of health harm.

43.     The present CO guideline used by Ford Motor Company, i.e. 27 ppm (and above), TWA, is not in conformity with our present understanding of science and medicine as it regards the effects of CO on human health, and as such is not appropriate for present-day use in approaching human health and safety with regard to CO exposure.

44.     To the extent carbon monoxide studies, research and literature demonstrate that even the lowest levels of carbon monoxide may cause health harm, it is unacceptable, unexpected and unnecessarily and/or unreasonably dangerous for the

interior of the 2011-2017 Ford Explorers to expose occupants to levels of CO in excess of that found in ambient air.

## GENERAL ALLEGATIONS

### Ford Sold and Leased Dangerous and Defective
### Vehicles to Law Enforcement

45.    FORD began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

46.    The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

47.    The 2011 through 2017 model year Ford Explorers were designed, engineered and manufactured by FORD with design flaws and/or defective exhaust and/or HVAC systems that, especially with the police modifications, permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner for law enforcement personnel.

48.    FORD designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2017 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a)    Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b)      Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c)      Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d)      Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e)      Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f)      Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles which is even a greater problem in police modified vehicles; and

(g)      Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

49.     FORD knew or should have known that the 2011 through 2017 model year Ford Explorers were dangerous and defective such that drivers and passengers of those vehicles and specifically the ones modified for police use may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

50.     The defective vehicles were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that the vehicles were free from defect and were properly equipped for the use for which they were intended.  At the time the defective vehicles were sold or leased by FORD directly and through its authorized agents, the vehicles were in violation of express and implied warranties.

51.     In promoting, selling and repairing its defective vehicles that are delivered to law enforcement personnel, FORD acts, upon information and belief, through fleet representatives as well as through numerous authorized dealers who act, and represent themselves to the public, as exclusive FORD representatives and agents.

52.     The fleet representatives and dealers act as FORD's agents and FORD enters into agreements with the law enforcement agencies through the fleet representatives and dealers. FORD directs its authorized fleet representatives and dealers to respond to complaints and inquiries concerning defective vehicles.

53.     FORD's control over the actions of its fleet representatives and dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein.  Authorized FORD dealerships are instructed by FORD to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130.

12

## Ford Acknowledged the Subject Vehicles'
## Defective Condition in TSBs 12-12-4 and 14-0130

54.     In response to customer complaints of an exhaust odor in the passenger

compartments of the subject vehicles, FORD issued TSB 12-12-4 in or about

December 2012.  TSB 12-12-4 was intended to provide instructions to authorized

Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013

model year Ford Explorers.

55.     In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015

model year Ford Explorers to the list of affected vehicles.  TSB 14-0130 was

intended to provide instructions to authorized FORD dealerships to correct the

presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

56.     Notwithstanding the issuance of TSBs 12-12-4 and 14-0130, FORD did not

inform Plaintiffs or the members of the proposed class, of the defects in 2011

through 2017 model year Ford Explorers, despite the fact that those defects

presented life safety issues to occupants of the vehicles.

57.     Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor

acknowledged therein is accompanied in the passenger compartment by lethal

carbon monoxide.

58.     At all material times, FORD has failed to inform law enforcement agencies

and personnel who are the end users of the 2011 through 2017 model year Ford

Explorers that they are unsafe for operation or that they were designed, engineered

and manufactured such that exhaust and other gases, including carbon monoxide,

may enter the passenger compartments of such vehicles.

13

59..    In addition, TSBs 12-12-4 and 14-0130 do not identify a specific fix to the exhaust odor problem.  Rather TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts.  This demonstrates that FORD knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2017 model year Ford Explorers from exhaust and other gases, including carbon monoxide.  Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 hoping, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

### FORD's TSBs 12-12-4 and 14-0130 Fail to Repair the Defects

60.    FORD's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

61.    TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2017 model year Ford Explorer and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

62.    In TSBs 12-12-4 and 14-0130, FORD requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSV 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft © Seam sealer (part number TA-2).

14

63.     TSBs 12-12-4 and 14-0130 requires that the dual rate air extractor replace the driver side rear air extractor initially on the subject vehicle.  The rear air extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the subject vehicles and enter the passenger compartment. Based upon information and belief, FORD requires the replacement of the driver side air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor.  The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

64.     The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE).  The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

65.     The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50.  However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the subject vehicles.  The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

66.    In addition, FORD modified the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130, by haphazardly adding a silicone- like white substance to the uppermost of the three "living hinges."  Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer.  Moreover, the silicone-like white substance added by FORD to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

67.    FORD designed, manufactured and engineered the 2011 through 2017 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment.  The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

68.    FORD designed, manufactured, engineered and assembled the 2011 through 2017 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles.

69.    FORD additionally designed, manufactured, engineered and assembled the 2011 through 2017 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air

conditioning lines.  Accordingly, TSBs 12-12-4 and 14-0130 require that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer.  However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

70.     TSB 14-0130 additionally requires the reprogramming of the HVAC module to the latest calibration.  Reprogramming the HVAC module, however, fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

### FORD's Conduct and/or Inaction Has Damaged
### Plaintiff and Members of the Proposed Class

71.     Plaintiff and each member of the proposed class has been damaged by FORD's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, and they unknowingly drive or are passengers in defective vehicles which cannot be safely operated.  They are exposed to unwanted and harmful fumes which create risk to their health and safety, while operating or driving in these vehicles.

### PLAINTIFFS' INDIVIDIUAL ALLEGATIONS

72.     At all relevant times, Plaintiff SISOLAK was a police officer employed by East Brunswick Township.

73.     At all relevant times, Plaintiff BOLCH was a police officer employed by East Brunswick Township.

74.     In 2014 and continuing to the Summer of 2017, SISOLAK was assigned to drive and operate a 2014 Ford Explorer, Vin No. 1FM5K8AR9EGC02146, by the East Brunswick Police Department ("the Department.")  As part of the fleet of police vehicles of the Department, this vehicle was car number 321.

75.     In 2014 and continuing to the Summer of 2017, BOLCH was assigned to drive and operate a 2014 Ford Explorer, Vin No. 1FM5K8AR9EGC02146, by the East Brunswick Police Department ("the Department.")  As part of the fleet of Police Interceptor vehicles of the Department, this vehicle was assigned car number 321.

76.     The 2014 Ford Explorer driven by Plaintiffs through the auspices of the Department, was one of approximately 25 Ford Explorers owned and purchased by East Brunswick Township.

77.     Upon information and belief, all of these Ford Explorers were dangerous and defective when purchased, because of their faulty design and the fact that their exhaust and/or HVAC systems permitted impermissible levels of exhaust and other gases, including carbon monoxide, to enter the passenger compartment of these vehicles.

78.      The above described defects in these Police Interceptor vehicles were latent in nature, because they were not obvious or ascertainable upon reasonable examination or inspection.

79.     At the time of the purchase, neither the Department nor Plaintiffs were notified that the 2014 Ford Explorers that were bought were defective, nor were

they notified that they and all occupants, including other police officers would be exposed to lethal carbon monoxide and other potentially dangerous gases while driving the 2014 Ford Explorer during routine police duties.

80.    At some unknown time before September 2017, the Department installed carbon monoxide detectors in its fleet of Ford Explorer Police Interceptor vehicles.

81.    These monitors would routinely go off and the police officers were not advised until September 2017, that the source of the beeping sounds was carbon monoxide detectors.

82.    In or about the last quarter of 2017, SISOLAK commenced experiencing headaches, dizziness and respiratory distress while operating the subject Ford Explorer Police Interceptor vehicles NO. 321.

83.    In or about the last quarter of 2017, BOLCH commenced experiencing headaches, dizziness and respiratory distress while operating the subject Ford Explorer Police Interceptor vehicles NO. 321.

84.    Plaintiffs have each filed Worker's Compensation claims for injuries sustained within the course of their employment, proximately resulting from dangerous levels of carbon monoxide in the driver cabin of their assigned Ford Explorer Police Interceptor.

85.    The entire fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the East Brunswick Police Department have been serviced and repaired by Malouf Ford, an authorized Ford Fleet Representative, located in North Brunswick, New Jersey.

86.     Upon information and belief, the entire fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the East Brunswick Police Department underwent FORD's earlier described Technical Service Bulletin repairs/replacements and the "fix" performed by Malouf was unsuccessful.

87.     In the alternative, Malouf was aware of the carbon monoxide defects in the entire fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the East Brunswick Police Department but did not know how to fix it.

88.     Plaintiffs continue to act as driver/operators of the fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the East Brunswick Police Department, and together with other similarly situated law enforcement personnel, are subjected to an ongoing nefarious danger with carbon monoxide exposure while driving these vehicles, as part of their job duties with the Department.

89.     To date, FORD has not repaired the Department's Ford Explorers, nor has FORD acknowledged to Plaintiff or the members of the proposed class or the county, municipal or state owners of these law enforcement modified Ford Explorers that the 2011 through 2017 model years contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of these vehicles

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the members of a proposed Class.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

91.   Plaintiffs seek to represent the following Class:

**All New Jersey police officers and law enforcement personnel who formerly or currently operate or drive at least one of the following vehicles, that has been modified by FORD, for police use:**

**2011 Ford Explorer, 2012 Ford Explorer, 2013 Ford Explorer, 2014 Ford Explorer, 2015 Ford Explorer, 2016 Ford Explorer and/or 2017 Ford Explorer.**

92.   Numerosity.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, on an annual basis, FORD has sold approximately 32,000 of these vehicles modified for police use. All of these Ford Explorers are covered by TSBs 12-12-4 and 14-0130 and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

93.   Existence of Common Questions of Law and Fact.  Common questions of law and fact exist as to all members of the class.  These include, but are not limited to:

(a)   whether the 2011 through 2017 model year Ford Explorers have been sold or leased subject to express and/or implied warranties;

(b)   whether each 2011 through 2017 model year Ford Explorer is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles;

(c)   whether the 2011 through 2017 model year Ford Explorers modified for police use suffer from a design defect, are unreasonable, dangerous and/or are unfit for their intended use;

(d)   whether FORD has knowledge of such defect;

(e)     when FORD learned of such defect;

(f)     whether FORD failed to disclose the defect to Plaintiffs and the class;

(g)     whether FORD misrepresented that the affected vehicles were safe;

(h)     whether Ford has a "fix" for the defect and, if so, how much the fix will cost;

(i)     whether FORD's express warranties cover the latent defects;

(j)     whether FORD breached its warranties made to plaintiffs and the class;

(k)     whether FORD negligently designed/engineered/manufactured the affected vehicles;

(l)     whether FORD concealed the defect; and

(m)    whether Plaintiff and the Class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

94.    Typicality.  The claims of the Plaintiffs are typical of the claims of the Class, as Plaintiffs and members of the Class are law enforcement personnel who are end users [operators or passengers] of these vehicles and have been physically harmed and personally injured in some manner by FORD's conduct.

95.    Adequacy.  Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs' interests do not conflict with the interests of the members of the Class.  Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action.

96.    Predominance and Superiority.  A class action is superior to other available methods for the fair and equitable adjudication of the controversy, since joinder of

all the individual class members is impracticable.  Questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

97.    The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for FORD.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member. Further, Plaintiff anticipate no difficulty in the management of this litigation as a class action.

98.    For all the foregoing reasons, a class action is superior to all other available methods, for the fair and efficient adjudication of this controversy.

## COUNT I
### (New Jersey Code, 2A:62A-21)

99.    Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

100.    Police officers spend 10 times more time in their vehicles, than ordinary citizens. *Kochhar, D. S., & Tijerina, L. (2002). Police vehicle struck rear-end crashes. http://www.cvpi.com/pdfs/CVPI_Problem_Description.*

101.    New Jersey Code, 2A:62A-21, provides as follows:

23

Additional right of action, recovery

1.   In addition to any other right of action or recovery otherwise available under law, whenever any law enforcement officer … suffers any injury, disease or death while in the lawful discharge of his official duties and that injury, disease or death is directly or indirectly the result of the neglect, willful omission, or willful or culpable conduct of any person or entity, other than that law enforcement officer,,,, the law enforcement officer suffering that injury or disease, or, in the case of death, a representative of that law enforcement officer, firefighter or first aid, emergency, ambulance or rescue squad member's estate, may seek recovery and damages from the person or entity whose neglect, willful omission, or willful or culpable conduct resulted in that injury, disease or death.

102.   At all relevant times, Plaintiffs and members of the Class operated and occupied Ford Explorer Police Interceptor vehicles, for multiple hours, each daily shift, during which they lawfully discharged their duties as law enforcement officers.

103.   At all times, while operating and occupying Ford Explorer Police Interceptor vehicles, Plaintiffs and members of the Class were exposed to unacceptable and dangerous levels of carbon monoxide and other potentially dangerous gases in the restricted passenger compartments of these vehicles.

104.   In this case, the unambiguous language of the Motor Vehicle Safety Act, 49 U.S.C. § 30101-30170 ("Safety Act"), placed a duty on FORD, a vehicle manufacturer, to report vehicle or equipment defects. (See 49 U.S.C. § 30118(c)).

105.   The Safety Act states that a manufacturer of a motor vehicle has a duty to notify the NHTSA and vehicle owners when it "learns [that] the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." Id. FORD breached this duty.

106.    Motor vehicle safety is defined as the "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident ...." Id. § 30102(8).

107.    FORD breached its duty, pursuant to the Safety Act, to disclose that from 2011-2017 it sold or leased approximately 32,000 Ford Explorers modified for law enforcement use nationwide, and that each such vehicle was sold or leased in a dangerous and defective condition containing design flaws, and/or an exhaust and/or HVAC system that permit unacceptable levels of carbon monoxide to enter the passenger compartment, during the normal and customary use of such vehicles.

108.    FORD breached its duty, pursuant to the Safety Act, to disclose that exhaust manifold cracks, were among the causes of the dangerous levels of carbon monoxide in the restricted passenger compartments of Ford Explorer Police Interceptor vehicles.

109.    Through customer complaints filed directly with FORD, FORD's authorized dealerships, NHTSA, internet websites, and other public venues, FORD had knowledge of the defects but did not disclose them to the Plaintiffs or the Class.

110.    The defects, as described herein, pose a risk of accidents, deaths and/or injuries, which directly relates to motor vehicle safety as defined by the Safety Act.

111.    All reasonable inferences can be made that FORD not only knew of the

defect, but also that FORD actively concealed its internal determination that the defect relates to motor vehicle safety.

112.    In addition to breaching its duties under the Motor Vehicle Safety Act, FORD also breached its implied warranty of merchantability under the UCC, as alleged herein.

113.    The continued and pervasive exposure to dangerous levels of carbon monoxide has adversely affected the health and safety of Plaintiffs and members of the Class.

114.    Plaintiffs and members of the Class have sustained personal injury and disease from their continued and persistent exposure to dangerous levels of carbon monoxide in the restricted passenger compartments of these vehicles.

115.    Plaintiffs and members of the Class have sustained personal injury and disease directly or indirectly resulting from the neglect, willful omissions and culpable conduct of FORD, as herein described.

116.     FORD is liable for damages that will fairly and justly compensate Plaintiffs and members of the Class, for all personal injuries directly or indirectly sustained as a result of FORD's neglect, willful omissions and culpable conduct, as herein described.

117.    FORD's actions and conduct, as described herein demonstrated a reckless disregard for the health, safety and welfare of Plaintiffs and members of the Class.

118.    FORD's actions and conduct, as described herein was immoral, unethical, oppressive and unscrupulous.

119.   FORD is liable to Plaintiffs and the members of the Class for punitive damages.

120.   FORD is liable to Plaintiffs and members of the Class for costs, including reasonable attorney's fees.

## COUNT II
### (New Jersey Products Liability Act, N.J.S.A. 2A:58C-2)

121.   Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

122.   As described herein, the 2011 through 2017 model year Ford Explorers were designed, engineered and manufactured by FORD with design flaws and/or defective exhaust and/or HVAC systems that, especially with the police modifications, permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner for law enforcement personnel.

123.   The defects described herein existed when the 2011 to 2017 Ford Explorer Police Interceptor vehicles left FORD's control.

124.   The defects, as described herein, caused Plaintiffs and members of the Class personal injury.

125.   Plaintiffs and members of the Class were reasonably foreseeable users of the subject vehicles.

126.   FORD did not inform Plaintiffs or members of the Class of the defects in 2011 through 2017 model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

127.    FORD failed to disclose that the carbon monoxide levels in the driver's compartment of the subject vehicles could potentially cause injury or death.

128.    FORD failed to inform law enforcement agencies and personnel who are the exclusive end users, that the subject vehicles are unsafe for ordinary operation and not reasonably fit, suitable or safe for their intended purposes.

129.    FORD had a duty to warn of dangers concerning the subject vehicles, irrespective of when knowledge of danger was or could have been acquired.

130.    Because FORD knew that the subject vehicles were defective, FORD had the duty to employees [Plaintiffs] of the purchaser [employer] to correct the defects and could not rely on the purchaser to make the necessary corrections. [*Seeley v. Cincinnati Shaper Co.*,256 N.J. Super. 1, 14 (App.Div.1992)]

131.    FORD's failure to warn constitutes a defect in the product sufficient to support a cause of action in strict liability. [*Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34 (1996)]

132.    FORD is strictly liable to Plaintiffs and members of the Class.

133.     FORD is liable for damages that will fairly and justly compensate Plaintiffs and members of the Class, for all personal injuries directly or indirectly sustained as a result of FORD's neglect, willful omissions and culpable conduct, as herein described.

134.    FORD's actions and conduct, as described herein demonstrated a reckless disregard for the health, safety and welfare of Plaintiffs and members of the Class.

135.   FORD's actions and conduct, as described herein was immoral, unethical, oppressive and unscrupulous.

136.   FORD is liable to Plaintiffs and the members of the Class for punitive damages.

137.   FORD is liable to Plaintiffs and members of the Class for costs, including reasonable attorney's fees.

## COUNT III
## BREACH OF IMPLIED WARRANTY
### (Article 2 of New Jersey's U.C.C, N.J. Stat. Ann. § 12A:2-101 et seq.,)

138.   Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

139.   At all relevant times, FORD was and is a merchant with respect to the subject motor vehicles, under N.J. U.C.C. § 12A:2-315.

140.   N.J. U.C.C. § 12A: 2:315 provides, as follows:

> 12A:2-315. Implied warranty: fitness for particular purpose
> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

141.   FORD entered into valid and binding contracts with Plaintiffs' employer, East Brunswick Police Department and similar law enforcement departments throughout the State of New Jersey, employing members of the Class, to produce and manufacture Ford Explorer vehicles, specifically modified by FORD, as Police Interceptor Models to be used as marked police vehicles.

142.   These contracts were expressly intended to confer direct benefits on law enforcement officers, including Plaintiffs, who would exclusively be operating and driving these vehicles on a daily basis.

143.   The benefits to Plaintiffs and Class members under these contracts with FORD were sufficiently immediate, rather than incidental.

144.   Plaintiffs and Class members are third part beneficiaries under these contracts.

145.   N.J. U.C.C. § 12A:2-318. provides, as follows:

> 12A:2-318. Third party beneficiaries of warranties express or implied
> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

146.   FORD impliedly warrantied that the subject vehicles, which FORD designed, manufactured, sold or leased, were merchantable, fit for the law enforcement purposes for which they were intended to be used, and were not otherwise injurious to law enforcement officers, including Plaintiffs and Class members, who would exclusively operating and driving said vehicles on a daily basis to discharge their official police duties.

147.   FORD impliedly warrantied that the subject vehicles were fit for the purposes for which they were intended to be used, and that they could be operated and driven for normal and customary law enforcement activities, without unreasonably exposing its operators/occupants to safety and health risks.

148.    FORD breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2017 model year Ford Explorer Police Interceptor vehicles, in an unsafe and un-merchantable condition, that exposed driver/occupants to unsafe carbon monoxide levels, while the vehicles were being driven in a normal and customary manner.

149.    Plaintiffs and members of the Class have sustained personal injury and disease from their continued and persistent exposure to dangerous levels of carbon monoxide in the restricted passenger compartments of these vehicles.

150.    Plaintiffs and members of the Class have sustained personal injury and disease directly or indirectly resulting from FORD's breach of its implied warranty of merchantability.

151.    Plaintiffs and the members of the class have suffered damages caused by FORD's breach of the implied warranty of merchantability.

152.    FORD is liable to Plaintiffs and members of the Class for compensatory damages.

152.    FORD is liable to Plaintiffs and members of the Class for costs, including reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, respectfully request judgment against FORD, as follows:

(a)    Certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

(b)     Awarding Judgment to Plaintiffs and all Class Members, for all available damages and other relief under the FIRST COUNT asserted;

(c)     Awarding Judgment to Plaintiffs, individually, for all available damages and other relief under the SECOND COUNT asserted;

(d)     Awarding Judgment to Plaintiffs and all Class Members, for all available damages and other relief under the THIRD COUNT asserted;

(e)     Enjoining FORD from selling or leasing any Ford Explorer Police Interceptors, with carbon monoxide leakage defects, that exposes law enforcement operators and/or passengers to hazardous, unsafe and unhealthy conditions;

(f)     Enjoining Plaintiffs and members of the Class from operating/driving 2011-2017 FORD Explorer Police Interceptors, until such time that FORD repairs and/or replaces defective parts/systems in the subject vehicles, to prevent carbon monoxide from entering the passenger compartments thereof;

(g)     Awarding Plaintiffs and members of the Class attorneys' fees and costs; and

(h)     Awarding any other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues.

Dated: July 19, 2018

BLAU, LEONARD LAW GROUP, LLC

Shelly A. Leonard
Steven Bennett Blau
23 Green Street, Suite 303
Huntington, NY 11743
(631) 458-1010
sblau@blauleonardlaw.com
sleonard@blauleonardlaw.com

32

BROWN PAINDIRIS & SCOTT, LLP:
Bruce E. Newman
747 Stafford Avenue
Bristol, CT 0601
Tel: (860) 583-520
Fax: (860)589-5780
bnewman@bpslawyers.com


*Attorneys for Plaintiffs*